DAVID L. AND JOYCE S. HENNINGER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Henninger v. Commissioner
Docket Nos. 20569-87, 20570-87, 20574-87, 1645-88, 1647-88, 1648-88, 14941-88, 17723-88
United States Tax Court
T.C. Memo 1991-574; 1991 Tax Ct. Memo LEXIS 622; 62 T.C.M. (CCH) 1283; T.C.M. (RIA) 91574; November 26, 1991, Filed *622 Decisions will be entered under Rule 155. Jack Elon Hildreth, Jr., for the petitioners. Thomas J. Travers, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined that petitioners in these consolidated cases were liable for deficiencies in tax and additions to tax as follows: Docket No. 20569-87 - David L. and Joyce S. Henninger
Additions to Tax
Year
Deficiency
[2]Sec. 6653(a)(1) [3]Sec. 6659 1980
$ 2,029.00
[4] $ 101.00
$ 609.00  1981
2,713.00
136.00
814.00
1982
4,350.00
218.00
1,305.00
1983
7,220.00
361.00
2,166.00
*623 Docket No. 20574-87 - David L. Henninger
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
1984
$ 5,254.00
$ 262.70
$ 1,576.20
Docket No. 1645-88 - Scott G. Sheldon
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
Sec. 6661
1980
$ 736.00  [4] $ 38.00 --   --  1982
1,662.00
63.00
499.00
1983
7,150.00
358.00
$ 1,576.00
$ 473.00
1984
3,107.00
155.00
--   --  Docket No. 1647-88 - Jerald L. and Dolores Sheldon
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
1981
$ 4,457.00
$ 223.00
$ 1,337.00
1982
637.00
32.00
--    1983
3,693.00
185.00
1,108.00
1984
4,611.00
231.00
1,383.00
Docket No. 1648-88 - Jerald L. Sheldon
Additions to Tax Year
Deficiency
Sec. 6653(a)
Sec. 6659
1980
$ 3,906.00
[5]$ 195.00 $ 1,172.00
*624 Docket No. 14941-88 - Anthony J. Lore
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
1984
$ 5,037.00
$ 252.00
$ 1,511.00
Docket No. 20570-87 - Dana K. Morgan
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
1983
$ 2,563.00
$ 144.00
$ 752.00  1984
4,564.00
228.00
1,369.00
Docket No. 17723-88 - Brett Cushing and Paula K. Cushing
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6659
1983
$ 8,831.00
$ 442.00
$ 2,649.00
1984
2,640.00
132.00
792.00
In addition, respondent, in his deficiency notices, seeks to impose increased interest under section 6621(c), formerly section 6621(d), based upon his determination that the deficiency for each petitioner for each of the years involved constituted a substantial underpayment attributable to a tax-motivated transaction. There remain for our consideration the following issues: (1) Whether the period of limitations has expired for *625 the assessment and collection from petitioners of any of the amounts at issue; (2) whether petitioners may claim losses from investments in a medical equipment-leasing program or in a furniture-leasing program; (3) whether petitioner Scott Sheldon may deduct claimed losses from the partnership Sales and Service for the taxable year 1984 or losses from an election to exclude Amada Financial Services from partnership treatment for 1983 and 1984; (4) whether petitioners Jerald L. and Delores Sheldon may deduct claimed losses from the Jay-Dee Ventures partnership for the taxable years 1983 and 1984; (5) whether petitioners Jerald L. and Delores Sheldon received unreported interest income from an insurance company in their taxable year 1983; (6) whether petitioner Anthony Lore may claim investment tax credits relating to the leasing of an automobile in 1984; (7) whether any part of any underpayment of taxes due from petitioners is due to negligence; (8) whether any of petitioners are liable for the 120-percent interest rate for tax-motivated transactions pursuant to section 6621(c), formerly section 6621(d); (9) whether petitioners Scott Sheldon or Brett and Paula Cushing are liable *626 for additions to tax under section 6661 as a result of making substantial understatements of income tax resulting from their investment in the equipment-leasing tax programs; and (10) whether petitioner Joyce S. Henninger may claim relief under the innocent spouse provisions of section 6013(e) for the years at issue. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the times they filed their petitions in these cases, petitioners David L. and Joyce S. Henninger resided in Riverside, California; petitioners Dana K. Morgan and Anthony J. Lore resided in Seal Beach, California; petitioner Scott G. Sheldon resided in Huntington Beach, California; petitioners Jerald L. and Delores Sheldon resided in Santa Ana, California; and petitioners Brett Cushing and Paula K. Cushing resided in Costa Mesa, California. The Tax Shelter Programs
Petitioners, in these consolidated cases, invested in a medical equipment tax shelter promotion called Holistic Profiles, Inc. (HPI). The program involved HPI's alleged sale of medical equipment to petitioners, and to others like them. Under *627 the terms of the promotion, HPI, as an agent of petitioners, was to lease the equipment to certain "holistic" medical clinics throughout the United States. HPI was headed by an individual named Ray W. Moss. Another individual named Tony Ortega was a promoter and salesman of the HPI program. Ortega is a high school graduate who attended college and took courses in accounting. Ortega owned and controlled an entity named Amada Financial Services. Ortega used Amada Financial Services to provide the financing of the HPI activities for the investors. Ortega also ran a tax-preparation service called Business and Financial Services, Inc. (BFS). BFS billed investors for management services in connection with the HPI investments. Correspondence between BFS and some of the investors referred to the HPI investment as a tax shelter. Ortega provided brochures and promotional materials to potential investors. Ortega represented that the investors would receive at least a 10-percent return on their cash investment. The promotional materials contained projections indicating that there would be negative taxable income and only a modest positive cash flow after a period of 5 years. Projections *628 for one such program, the "Program C Electroneurograph Computer," indicated that there would be negative taxable income and a negative cash flow after the 5 years projected. These materials stressed the "strong potential for economic profit through income derived on a monthly basis along with the scale [sic, read "sale"] of the equipment on the termination of the lease." These materials, however, failed to present any projections for a residual value of the equipment on the termination of the lease. The basic brochure was a 4-page document that stressed the tax benefits to be gained from investing in the HPI promotion. A financing and investment summary set forth cash-flow projections that subtracted interest payments in demonstrating the availability of deductible expenses. These same projections, however, then demonstrated a positive cash flow by adding back the interest payments as noncash payments and subtracting the investor's loan payments. The promoters of the program also provided a more elaborate written description of the program, which, when discussing the economic viability of investments, departed from conventional spelling (a lessee clinic would prepare "symtomology *629 profiles"), and from conventional syntax: each needed business, medical, and testing department must be autonomous, yet compliment [sic] each other in an operational environment. In summary, Holistic Profiles, Inc. is satisfied that the invested leased dollar to complement supplement and augment the operation of these clinics, offers as limited a risk investment as possible as well as capitalizing on a growth industry at this point in time is just on the threshold of growth.
An accountant named William Whalen assisted Ortega in writing the cash-flow projections in the promotional materials; for doing so he received a salary from Moss and Ortega. He also attended seminars set up to promote investments in the HPI program. Ortega's general practice was to charge his clients a 10-percent downpayment for the equipment purchased. He asked the investors for 1 percent in cash and had them execute a short-term note for the remaining 9 percent, which they would pay when they received the tax refunds generated by their investment in HPI. He also had them execute long-term notes for the 90-percent balance of the purchase price. Ortega prepared petitioners' Federal income tax *630 returns for the years in question. Ortega had many of the HPI investors use his address as the mailing address for the tax refunds generated by the HPI program. By doing so, Ortega could apply the refunds to the balance of the downpayments due on the HPI investments. Moss and Ortega had a falling-out in 1984 and entered into a settlement agreement in which each released the other from all claims. Pursuant to this agreement, Ortega agreed to pay Moss $ 45,000, and Moss agreed to return notes executed in favor of HPI by Ortega's clients. In 1985, petitioners learned that none of the equipment that they had allegedly purchased was ever in fact owned by HPI, nor had it ever been placed in service with the ultimate lessees. Ortega also ran New Dimension Leasing (NDL), purportedly an office furniture-leasing program. Ortega advised that the furniture-leasing program could be used as a rollover investment for his clients because of the problems with the HPI program. Although some furniture had been imported from Mexico, the bank financing for that deal never materialized, and no furniture was ever placed in service in connection with the NDL program with respect to petitioners in *631 this case. Ortega further advised the clients that they could roll over their HPI investments into a wind turbine investment plan or into a program involving equipment located at a hotel, or into another miscellaneous investment program. Ortega later offered promissory installment notes to the investors. These offers represented his promise to refund amounts invested. Ortega subsequently pled guilty in response to charges of tax fraud and grand theft. He conceded that he had fabricated the amounts he had reported for costs, income, and expenses on his clients' tax returns. He had based those figures on the projections contained in the promotional materials. Petitioners David L. and Joyce S. Henninger
Petitioner David L. Henninger (Henninger) is a truck driver; he has an associate of arts degree from Riverside City College. Petitioner Joyce S. Henninger legally separated from petitioner Henninger on June 1, 1983. She executed a petition for divorce, and process was served on Henninger on February 24, 1984. They were divorced on February 13, 1985. Although separated, they filed a joint return after investing in HPI. Henninger agreed to claim for himself the tax benefits *632 at issue in exchange for paying Joyce some $ 500. Their divorce settlement agreement contained the following language: Husband shall indemnify Wife and hold Wife free and harmless from any and all tax liability which may arise from the amended federal returns filed for the 1980-82 tax years and from the joint federal and state returns filed for the 1983 tax year. Husband shall pay all costs, fees, expenses, penalties or other assessments incurred for, or arising from, any audit or other proceeding relating to any of the returns.
Henninger became acquainted with Tony Ortega through a co-worker, Scott Sheldon, late in 1983. Scott Sheldon recommended Ortega and described the payment of $ 39 per month generated by a $ 2,000 investment that Ortega had arranged in a "Propane Conversion Unit." At a meeting with Ortega in 1983, Henninger received some handwritten notes regarding potential investments in HPI. These notes showed that an investment in HPI would generate State and Federal tax refunds, plus tax savings for the current year, totaling some $ 15,405. From this figure, the notes subtracted the downpayment to HPI of $ 11,000, showing a net savings of $ 4,405. On December *633 17, 1983, Henninger executed a Purchase and Security Agreement with HPI to purchase "4 Units of X-ray" for $ 110,000. Henninger paid $ 2,000 as a deposit on this investment. Ortega thereafter prepared the Henningers' 1983 and 1984 Federal income tax returns. The Henningers' income tax refund in 1984 generated by the HPI investment went toward paying the $ 9,605.54 balance of the downpayment, including $ 605.54 in interest, on the equipment. Henninger never inspected the equipment he allegedly purchased. Although the equipment was allegedly leased to a holistic medical provider, Ortega did not inform Henninger of the identity of that lessee, nor where the equipment was located. During the time Henninger thought that he owned the equipment, he never received documentation of the amounts of income and expenses resulting from his lease of the equipment. The only evidence of income and expense appeared on the State and Federal income tax forms that Ortega prepared for him. Henninger asked Ortega about the failure of the equipment to generate income and was advised that there had been miscalculations about the costs involved. Henninger did not question Ortega about the claimed *634 tax deductions and credits. Henninger relied entirely upon Ortega regarding the existence and operation of his equipment. As a result of his investment in HPI, Henninger claimed Federal income tax credits of $ 10,500, plus deductions of $ 21,812 for 1983. He claimed deductions of $ 16,101 for 1984. Henninger applied the credits to 1983, eliminating any tax liability for that year. He carried back the excess credits to eliminate any tax liability for 1980 and 1981 and to reduce his reported tax liability for 1982 to $ 159. He claimed refunds for the taxes he had paid for those prior years. Henninger did not discover that HPI did not have his equipment, and that it had not been placed in service, until 1985. During that year, Ortega attempted to roll over the Henningers' investment, by crediting their investment in HPI to a wind turbine tax shelter. Respondent mailed statutory notices of deficiency regarding the years at issue to the Henningers on April 1, 1987. For the year 1983, respondent's disallowances of the HPI deductions and credits affected the amounts available to the Henningers under the formulas applicable to the married couples deduction and to the dependent and *635 child care credit. Petitioner Scott G. Sheldon
Scott G. Sheldon (Sheldon) is a truck driver and a high school graduate. He works with petitioners Henninger and Brett Cushing, and he is the son of petitioners Jerald L. and Delores Sheldon. Sheldon met Tony Ortega through the efforts of Sheldon's girlfriend, Lisa Ganow, who worked for Tony Ortega. Ortega regularly paid Lisa commissions for bringing in new clients. In 1983, Ortega suggested that Sheldon invest $ 2,000 in a Propane Conversion Unit. Sheldon received $ 39 monthly from this investment. At a meeting with Ortega in 1983, Sheldon received handwritten notes indicating that by investing $ 4,629 in the HPI program, Sheldon would obtain "tax savings refunds" of $ 4,467 and "future write-offs" of $ 3,600 through the year 1985, plus "income" of $ 3,768 for the same period. On December 16, 1983, Sheldon signed a Purchase and Security Agreement with HPI for "5 Inline Transit Computers" for the price of $ 85,750, agreeing to pay HPI in 120 monthly payments of $ 1,245.13 over a 10-year period. On December 31, 1983, Sheldon signed a second Purchase and Security Agreement with HPI; this time he agreed to buy "2 Units Electroneurograph *636 Equipment" for a price of $ 95,000, agreeing to pay HPI in 120 payments of $ 1,379.50 for a 10-year period. Sheldon knew that one of these two purchases was meant to replace the other, but he could not recall which was which. As a prior customer of Ortega's (presumably in the propane deal), Sheldon was not required to pay any cash at the time of purchase. The agreements he signed indicated that the downpayments for the equipment were to be paid after receipt of his income tax refunds generated by the investment. He does not recall the application of the equipment he purchased, nor did he know where it was to be located, nor the name of the lessee. Tony Ortega prepared Sheldon's 1983 and 1984 Federal income tax returns, as well as his 1980 and 1982 amended Federal income tax returns, in which credits arising from the HPI investment were claimed for 1983 and carried back to prior years. On his 1983 and 1984 returns, Sheldon claimed additional losses of $ 2,326 and $ 2,361 relating to an election to exclude Amada Financial Services from treatment as a partnership under the Internal Revenue Code. On Sheldon's 1984 return, Ortega reported losses of $ 9,722 from an entity called *637 "Sales and Service." Sheldon did not read the tax returns which Ortega prepared and sent to him, and which he signed. Sheldon's Federal income tax returns for 1983 and 1984 were timely filed. For the years in issue, Sheldon invested some $ 4,500 with Tony Ortega; respondent determined deficiencies totaling some $ 12,655 resulting from the disallowance of deductions and credits arising from Ortega's programs. Sheldon received notice that the equipment did not exist on December 26, 1985. At that time, Ortega sent Sheldon a document in which Ortega proffered a promissory installment note in the amount of Sheldon's cash investment. In exchange for this note, Sheldon would release all claims against Ortega or his businesses. On January 12, 1987, Merrily Probst, the representative of Sheldon, and the District Director, Internal Revenue Service, entered into an agreement for the 1983 tax year entitled "Special Consent to Extend the Time to Assess Tax," Form 872-A. This agreement by its terms extended the period of limitations for assessing taxes for 1983 until the 90th day after respondent's receipt, from Sheldon or his representative, of a "Notice of Termination of Special Consent *638 to Extend the Time to Assess Tax," Form 872-T. Respondent received such a notice on July 24, 1987, executed by Jack Elon Hildreth, Jr., Sheldon's new representative. Respondent mailed a statutory notice of deficiency with respect to the years involved to Sheldon on October 21, 1987. Petitioners Jerald L. and Delores Sheldon
Jerald L. Sheldon is a building inspector who has taken engineering courses. He first met Tony Ortega late in 1980. Jerald Sheldon had been unhappy with the tax consultant he had employed for an audit of his 1979 and 1980 tax years. The issue during that audit concerned Jerald Sheldon's substantiation of claimed expenses in connection with a motorcycle repair business. During this audit, the former tax consultant informed Jerald of the need to maintain receipts and records for tax purposes. Tony Ortega first approached Jerald Sheldon regarding the HPI activity in 1983. Jerald's son, Scott Sheldon, recommended the investment and told his father of the $ 39 per month generated by the propane gas investment he had arranged through Ortega. On December 28, 1983, Jerald and Delores Sheldon entered into a Purchase and Security Agreement with HPI regarding *639 the purchase of "2 Units Electroneurograph Equipment" for the price of $ 95,000. On December 31, 1983, Jerald and Delores Sheldon signed a promissory note agreeing to pay HPI $ 9,500, plus interest, in 180 days, as their downpayment for the HPI activity. On the same date, they executed a secured note agreeing to pay HPI $ 85,500 in 120 equal monthly installments of $ 1,379.42, commencing on January 1, 1984 and ending on December 31, 1993. In May of 1984, Jerald and Delores Sheldon paid the 180-day note for the $ 9,500 downpayment, plus interest of $ 285, using the proceeds of the income tax refund received as a result of their investment in the HPI activity. Jerald Sheldon does not know for sure what he purchased in the HPI activity. He did not see the actual equipment; he saw only a picture of the equipment he purportedly purchased from HPI. He does not recall the locations of the hospitals in which the HPI equipment was to be placed, nor does he know what percentage of the equipment his "2 units" represented. He did not know if there were other owners of the equipment. Correspondence to Jerald Sheldon from Tony Ortega's BFS tax service referred to the HPI activity as a "tax *640 shelter." Tony Ortega prepared Jerald and Delores Sheldons' 1983 and 1984 Federal income tax returns. When he signed the 1983 return, Jerald Sheldon asked Tony Ortega if he had any evidence of the income and expenses claimed for the HPI activity, and took Ortega's word that "everything was legal." With respect to the tax benefits claimed as a result of the HPI investment, Jerald Sheldon relied entirely on the representations of Mr. Ortega. Jerald Sheldon liked the fact that he was going to get money back from the Government. Jay-Dee Ventures was Jerald and Delores Sheldon's plan to open a park for recreational vehicles, and, under Ortega's guidance, they deducted losses for 1983 resulting from the operation of "Jay-Dee Ventures" on their 1983 Federal income tax return. They also reported receiving $ 56 as interest payments from New York Life Insurance Company on their 1984 return. Late in 1985, after he had informed the investors of the failure of the HPI program, Ortega offered Jerald and Delores Sheldon the opportunity to roll over their HPI investment into what Jerald Sheldon called a "windmill" program. Ortega also made the representation that, in the alternative, he would *641 repay the money they had invested. On January 12, 1987, the District Director of the Internal Revenue Service for the Los Angeles District proposed to the Sheldons a "Special Consent to Extend the Time to Assess Tax," Form 872-A, for the year 1983. Merrily Probst, the Sheldons' representative, signed the consent on their behalf. On July 24, 1987, respondent received an executed Form 872-T from Jerald and Delores Sheldon's new representative, Jack Elon Hildreth, Jr., for the years 1980-1984, inclusive. This document revoked the prior special consent; upon its receipt, respondent had 90 days within which to mail a timely notice of deficiency for 1983. Respondent mailed the notices of deficiency to the Sheldons on October 21, 1987. Therein respondent determined that Jerald and Delores Sheldon owed deficiencies in Federal income tax totaling $ 17,304 as a result of investing in Ortega's tax programs. Petitioner Anthony J. Lore
Petitioner Anthony J. Lore (Lore) was a resident of Seal Beach, California, at the time he filed his petition in this case. Lore attended the University of California at Los Angeles, where he majored in communications. Lore has worked for a number *642 of years in the marketing field. Lore first met Tony Ortega through the advice of his girlfriend, later his wife, Dana K. Morgan. Lore thought that Ortega was a Certified Public Accountant, but he did not inquire as to Ortega's professional status. Lore executed a Purchase and Security Agreement dated December 30, 1983, between himself and Amada Financial Services for the purchase of "Medical and Dental Equipment" for the price of $ 45,000. He executed a short-term note for the downpayment of $ 4,500. By a "Secured Note" dated December 30, 1983, Lore promised to pay Amada Financial Services the balance, some $ 40,500, plus interest, in 60 monthly payments of $ 1,028.44, beginning January 1, 1984. Lore himself made no payments on the latter note. A Financial Statement, dated December 28, 1983, and filed on August 23, 1984, describes the property that Lore purchased as a "Fisher 4450" and a "GE 1487." Lore assumed that these items referred to components of electroneurograph equipment. The Financial Statement describing the specific property is dated 2 days earlier than the Purchase and Security Agreement, which does not describe specific property. Lore paid $ 450, 1 percent *643 of the purchase price, on March 28, 1984. He then paid the remaining 9 percent of the downpayment ($ 4,050.00 plus $ 272.63 interest) after receipt of his Federal Income tax refund check from Tony Ortega's office. Tony Ortega prepared Lore's 1984 Federal income tax return, on which Lore claimed income, deductions, and losses for the HPI activity. [6] The net result was a claimed loss of $ 10,121. When he signed his 1984 Federal income tax return, Lore did not know who his co-owners in the equipment were, who the lessee of the equipment was, or where the lessee was located. He was unaware of the monthly rent paid by the putative lessee, and he never saw any checks paid by the lessees to prove that the HPI lease produced any income. Lore did not execute any form of agreement with the other owners of the electroneurograph equipment he purchased. *644 Lore's 1984 Federal income tax return was timely filed. He claimed the HPI losses set forth above, and he claimed a $ 1,980 investment tax credit resulting from the apparent leasing of an automobile. Lore discovered the equipment was nonexistent in mid-1985. In 1986, Lore participated in a Confession of Judgment Statement executed by Tony Ortega and recovered partial restitution of the amounts he had invested in HPI. Respondent mailed to Lore the notice of deficiency relating to 1984 on March 23, 1988, determining a deficiency of $ 5,037.00 plus additions to tax. Petitioner Dana Morgan
Dana Morgan earned a bachelor of science degree from the University of Southern California. At time of trial, she was married to petitioner Lore and had been employed as an account executive for a mortgage insurance company. In the course of her business, Ms. Morgan met a Jeanette Wisdom, who told Ms. Morgan that Ms. Wisdom's colleague, one Dan Fincher, had investigated Tony Ortega's program and thought it sound. Fincher was an associate of Ortega's and regularly received commissions from Ortega for referring clients to Ortega. Dana Morgan and her future husband, Lore, then met with Ortega. *645 Ms. Morgan reviewed the HPI brochure and saw pictures of some equipment. She executed a Purchase and Security Agreement dated December 30, 1983, between herself and Amada Financial Services for the purchase of "Medical and Dental Equipment" at a price of $ 15,000. Exhibit A of that agreement is blank where it calls for a "Make/Trade Name" and "Identification Number" of that equipment. It states the deferred portion of the purchase price as $ 13,500. Although her deferred price was some $ 13,500, in a Secured Note also dated December 30, 1983, Ms. Morgan promised to pay Amada Financial Services some $ 13,000, plus interest, in 60 monthly payments of $ 342.83. She paid 1 percent of the purchase price ($ 150) in cash; she did not pay the balance of the downpayment ($ 1,350 plus $ 122.10 interest) until she received the Federal income tax refund generated by her HPI investment. In 1984, Dana Morgan entered into a similar transaction, again with Ortega's Amada Financial Services, allegedly acquiring furniture equipment at a cost of $ 15,900. This deal was later canceled. Ortega prepared her Federal income tax returns for 1983 and 1984. Her 1983 return was filed on June 18, 1984; *646 it gave Tony Ortega's office as her address. Although the return was filed after April 15, 1983, she was not charged with a delinquency addition because the amount of her prepayments exceeded the amounts of taxes due, as determined by respondent. Her 1984 return was apparently timely filed, and this time it gave her Seal Beach home address. On her 1983 and 1984 Federal income tax returns, Ms. Morgan claimed income, deductions, and losses for the HPI activity and the subsequent furniture investment. In 1983, she deducted some $ 6,818 relating to the medical and dental equipment investment, and she claimed tax credits for $ 1,000. In 1984, she claimed some $ 9,743 in Schedule C deductions plus tax credits of $ 1,838. She did not see the medical equipment, nor did she know the identity of the lessee, other than hearing from Ortega that one lessee was a "female person," and that the HPI equipment was installed "somewhere at some hospital." She did see some furniture stored at her husband's warehouse, which she understood to be Ortega's furniture. Correspondence from Tony Ortega's BFS business set forth the deal as a "Tax Investment." Respondent disallowed the deductions and credits *647 relating to these investments and determined deficiencies of $ 2,563 for 1983 and $ 4,564 for 1984. Like the other investors, Dana Morgan learned of the equipment's nonexistence in 1985. In 1986, with her husband Lore, Dana Morgan participated in a Confession of Judgment Statement with Tony Ortega and recovered partial restitution of the amounts she had invested in HPI. [7]
Petitioners Brett and Paula Cushing
Petitioners Brett and Paula Cushing (the Cushings) met Tony Ortega through the recommendation of petitioner Sheldon, a co-worker of Brett Cushing's. Brett Cushing understood from Sheldon that Ortega was a Certified Public Accountant. The Cushings first met Ortega in December of 1983. *648 Prior to meeting Ortega, Brett Cushing had prepared his own income tax returns. He also signed a Purchase and Security Agreement with HPI for "One Electroneurograph Equipment" for $ 47,500. On December 30, 1983, Brett Cushing signed a Secured Note, agreeing to pay HPI $ 42,750 in monthly installments of $ 689.75, over a 10-year period beginning January 1, 1984. Brett Cushing made a cash deposit of $ 250 when he signed the Purchase and Security Agreement; he paid another $ 225 in January of 1984. After receiving his 1983 Federal income tax refund, generated by the HPI activity, he paid $ 4,403.10 as the rest of the downpayment cost, plus $ 128.10 interest. Ortega prepared the Cushings' 1983 and 1984 Federal income tax returns. For 1983, the Cushings claimed HPI and office furniture deductions in the net amount of $ 12,060 and investment tax credits arising from the HPI investment of $ 4,750. For 1984, they claimed HPI deductions totaling $ 7,983. Brett Cushing knew nothing about the income or expenses described on his 1984 Federal income tax return in connection with the HPI activity. Brett Cushing never made any inquiries of Ortega about the money he was supposed to have *649 received in 1983 and 1984 from the HPI activity. He instead relied upon Ortega as to the correctness of the income, deductions, and losses claimed in connection with the HPI activity on his 1983 and 1984 Federal income tax returns. The Cushings' Federal income tax returns for 1983 and 1984 were timely filed. The Cushings did not discover that the equipment did not exist until sometime in 1985. In January of 1986, Ortega sent a promissory note to the Cushings, indicating that he would repay the money invested in a series of installments. On December 2, 1986, the Cushings, through their designated representative Merrily Probst, and the District Director of the Internal Revenue Service entered into a "Special Consent to Extend the Time to Assess Tax," Form 872-A. Respondent received a Form 872-T for the years 1980-1984, inclusive, filed by Jack Elon Hildreth, Jr., the Cushings' new representative, on March 1, 1988. Respondent mailed a notice of deficiency with respect to the amounts at issue on April 11, 1988. Therein respondent disallowed the claimed HPI and office furniture deductions and determined deficiencies of $ 8,831 for 1983 and $ 2,640 for 1984. These disallowances *650 also affected the amounts available to the Cushings for the married couple deduction in 1984. OPINION Period of Limitations
Section 6501(a) provides (with certain exceptions not material here) that respondent shall assess deficiencies in income taxes within 3 years after the return is filed. Section 6501(b)(1) provides that, for the purposes of section 6501, a return filed before the due date shall be considered as being filed on the date it is due. Section 6501(j) provides that deficiencies resulting from investment tax credit carrybacks may be assessed within the period applicable to the year that produced the carrybacks. An exception to the 3-year assessment provision of section 6501(a) is provided in section 6501(c)(4), which allows a taxpayer and respondent to consent in writing to extend the period of assessment, if they make such an agreement before the expiration of the 3-year period. The expiration of the period of limitation on assessment is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability. Rules 39, 142(a). To establish this defense, petitioners must make a prima facie case establishing *651 the filing of their returns, the expiration of the statutory period, and receipt or mailing of the notice after the running of the period. Coleman v. Commissioner, 94 T.C. 82, 87 (1990); Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); Robinson v. Commissioner, 57 T.C. 735, 737 (1972). Where the party pleading the defense makes such a showing, the burden of going forward with the evidence shifts to respondent who must then introduce evidence to show that the bar of the statute is not applicable. Coleman v. Commissioner, 94 T.C. at 89; Adler v. Commissioner, 85 T.C. 535, 540 (1985). Where respondent makes such a showing, the burden of going forward then shifts back to the party pleading the affirmative defense to show that the alleged exception to the expiration of the period is invalid or otherwise inapplicable. Coleman v. Commissioner, supra; Adler v. Commissioner, supra.The burden of proof, i.e., the burden of ultimate persuasion, however, never shifts from the party who pleads the bar of the statute of *652 limitations. Coleman v. Commissioner, supra; Adler v. Commissioner, supra.
The returns for David and Joyce Henninger for 1983 and 1984 were timely filed. Respondent was thus required to mail the statutory notice of deficiency to them by April 15, 1987, in order to assess and collect deficiencies for the earlier of those years. Respondent mailed statutory notices of deficiency for the years 1983 and 1984 to petitioners David and Joyce Henninger on April 1, 1987, 2 weeks before the expiration of the period of limitations. Sheldon's representative executed a valid consent extending the period of limitations on January 12, 1987. His new representative submitted a Form 872-T, revoking the prior consent, which respondent received on July 24, 1987. Respondent was thus required to mail the statutory notice of deficiency for the years involved to Sheldon within 90 days of that date. Respondent mailed such a notice to Sheldon on October 21, 1987, the 89th day after receipt of the Form 872-T. Respondent thus mailed the notice within the period of limitations. The situation is the same for his parents, Jerald L. and Delores Sheldon. Their *653 representative executed a valid consent extending the period of limitations on January 12, 1987. Their new representative submitted a Form 872-T, revoking the prior consent, which respondent received on July 24, 1987. Respondent mailed a statutory notice of deficiency to them on October 21, 1987, within the 90-day period. Petitioners now attack respondent's records attesting to the dates upon which the operative documents were mailed and/or received. We have examined these documents, and we have found that they substantiate the pertinent dates as set forth in our findings. Respondent has properly placed before us, as records of regularly conducted activity, the documents reflecting the dates of receipt of the Forms 872-A extending the period of limitations, the dates of receipt of the Forms 872-T terminating those extensions, and the dates of mailing of the statutory notices of deficiency. These records substantiate the claimed dates of receipt and of mailing. We recognize that respondent's certificates of mailing are not on their face Forms 3877, and thus they are not entitled to the presumption of official regularity given to those terms. Coleman v. Commissioner, 94 T.C. at 91-92. *654 Here, however, the certificates of mailing, when coupled with the testimony of respondent's employees, represent convincing evidence of timely mailing of the notices of deficiency at issue. See Coleman v. Commissioner, supra.
The Deficiencies
Rule 91(e) provides as follows: Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * * In this case, the parties have stipulated as follows: All the petitioners involved in this consolidated case concede that the medical/dental equipment and/or furniture did not exist and that all income, deductions, losses and credits from the Holistic Profiles and New Dimensions leasing investment are disallowed for all years.
The parties' stipulation puts an end to the matter of the deficiencies regarding the HPI and furniture-leasing programs. The Court has not been asked to relieve *655 petitioners of their stipulation, and it sees no reason to do so. Nevertheless, petitioners now argue that they are entitled to claim some of the deductions generated by those programs. These arguments are inconsistent with their stipulation, and, except as set forth below, they are therefore unavailing. [8] As a general matter, petitioners' arguments are patently erroneous under settled principles of law. Petitioners initially urge that they are entitled to claim business expense deductions under section 162 arising from their investment in the HPI program. They have not demonstrated that any of their payments were "ordinary and necessary" *656 expenses under section 162, or the amounts of such payments. Although they urge that they paid certain fees to Ortega, they have not demonstrated that the amounts paid to Ortega properly fit into those categories. Zmuda v. Commissioner, 79 T.C. 714, 724-725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioners urge that, in some instances, they are entitled to deduct tax preparation fees paid to Ortega. Petitioners have overlooked the fact that respondent has not disallowed the deduction of those fees, and that their contentions are thus not at issue. Petitioners made the bulk of their expenditures to acquire capital assets -- equipment to be used in a business. To the extent they claim ordinary losses from these expenditures, such losses would be governed by section 165(a). That section, however, is also unavailing. We will not allow deductions under section 165 for losses based upon nonexistent transactions. Transactions which are nothing more than factual shams are not recognized for such purposes. Forseth v. Commissioner, 85 T.C. 127, 164 (1985), affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987). *657 In this case, it is conceded, and we have found, that the HPI and the furniture-leasing transactions were nothing more than shams. There was no such equipment acquired; there were no lessees or rental payments. Petitioners also claim that they are entitled to deduct the amounts at issue as bad debts under section 166. The regulations promulgated pursuant to section 166 state, "Section 166 provides that, in computing taxable income * * * a deduction shall be allowed in respect of bad debts owed to the taxpayer." Sec. 1.166-1(a), Income Tax Regs. (Emphasis supplied.) Additionally, only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship "based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.
Here, petitioners have not demonstrated that the amounts at issue were owed to them, the taxpayers. Instead the amounts at issue were owed by them to the promoters of the HPI scheme. Petitioners are the debtors, not the creditors, and thus are not entitled to a deduction under section 166. Additionally, with respect to the cash *658 amounts they invested in the HPI scheme, they have not established that these investments established a debtor-creditor relationship "based upon a valid and enforceable obligation to pay a fixed or determinable sum of money," as required by sec. 1.166-1(c), Income Tax Regs. Section 166 is of no help to petitioners. [9]
Petitioners urge, in the alternative, that they are entitled to deduct the amounts at issue as theft losses under section 165. Petitioners' theory apparently is that they were defrauded of their money by the failure of Moss or Ortega to perform as promised. Theft losses are not deductible until the year of discovery. Sec. 165(e); sec. 1.165-8(a)(2), Income Tax Regs. Here, none of petitioners discovered the alleged theft losses until 1985, after the years in issue. Petitioners urge, however, *659 that Ortega discovered the losses in 1984, and that, as their agent, petitioners constructively discovered the loss in 1984. The knowledge of an agent is not attributed to his principals for purposes of discovering a theft loss if the agent does not act within the scope of his duties as an agent. Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229 (3d Cir. 1967), affg. a Memorandum Opinion of this Court; see Asphalt Industries, Inc. v. Commissioner, T.C. Memo 1968-155 n.2, affd. 411 F.2d 13 (3d Cir. 1969). Here, Ortega did not reveal his discovery of the equipment's nonexistence to petitioners in 1984; in fact, he prepared their income tax returns for that year as if the equipment actually existed and had been placed in service. If Ortega was properly petitioners' agent, his failure to inform the taxpayers of his discoveries, and his preparation of income tax returns in a manner that was inconsistent with his discoveries, were plainly outside the scope of his duty to petitioners. Petitioners did not discover the losses at issue until 1985, constructively or otherwise. Moreover, to be entitled to a theft loss deduction, *660 a taxpayer must show that the loss is discovered in a year for which "it can be ascertained with reasonable certainty whether or not * * * reimbursement will be received." Sec. 1.165-1(d)(3), Income Tax Regs. See also sec. 1.165-8(a)(2), Income Tax Regs.; Alison v. United States, 344 U.S. 167, 170, 97 L. Ed. 186, 73 S. Ct. 191 (1952). Petitioners have not shown that, as of December 31, 1984, they could not have recovered from Ortega, or from Moss, any of the amounts claimed to have been lost. Indeed, beginning in 1985 Ortega subsequently placed, or sought to place, some of petitioners into new tax shelters as substitutes for their HPI investments. When these substitutions were unavailing, he offered most petitioners promissory installment notes in repayment of the amounts that they had invested. For their part, Lore and Dana Morgan obtained Confessions of Judgment against Ortega in 1986, pursuant to which he promised to make restitution. While we do not decide whether these undertakings of Ortega amounted to actual reimbursement, they do show that petitioners have not proved that there was no prospect of recovery during the years in issue. [10]
*661 Petitioners have burdened the Court with a confusing and often incomprehensible record and with arguments that have no merit. In one respect, however, we believe that the evidence supports the deduction of some amounts disallowed by respondent. In Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 92 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983), and Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989), the investors issued recourse notes to the promoters of tax shelter plans. The Fourth Circuit in Rice's Toyota, and subsequently this Court in Rose, allowed the deduction of interest actually paid on those notes. As the Fourth Circuit noted, section 163 "does not limit deductibility of * * * interest expense depending upon the item purchased by the taxpayer." Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96; see Rose v. Commissioner, 88 T.C. at 423. The same considerations apply here. Interest was paid on the short-term notes, and they were satisfied out of the refunds generated. The short-term *662 notes constituted what appears to be payment to the promoters and although the transactions do not pass muster, the short-term notes are genuine. In terms of interest actually paid in 1984 on their short-term downpayment notes, Henninger paid $ 605.54, Jerald L. and Delores Sheldon paid $ 285, Lore paid $ 272.63, Dana Morgan paid $ 122.10, and Brett and Paula Cushing paid $ 128.10. [11] Petitioners did not deduct these amounts as interest on Schedule A of their personal income tax forms. Instead, these amounts appear to have been included as interest on their Schedule C's, and, as such, wholly disallowed by respondent. Notwithstanding the stipulation, we hold that these amounts are properly deductible for 1984 under section 163 to the extent set forth above. The record, however, does not enable us to determine the amount, if any, of such interest actually paid by Sheldon for 1984. Accordingly, he has failed to establish that he is entitled to any deduction under section 163 arising from his investment in the HPI activity. *663 Petitioners have not proved that they are entitled to deduct any other amounts claimed as Schedule C interest. A valid enforceable debt is needed to support a debtor's deduction, under section 163, of interest paid upon that debt. Petitioners have not proved that they paid any such interest, nor have petitioners established that the long-term notes given in payment for the nonexistent equipment constituted genuine enforceable indebtedness. Their lack of knowledge about the program and their reliance upon the promoter do not constitute a defense to their failure to establish the validity of those debts. Goldberg v. United States, 789 F.2d 1341 (9th Cir. 1986). Sales and Service Partnership
Respondent disallowed a loss claimed by Sheldon attributable to an activity known as "Sales and Service." Sheldon then conceded this issue in his brief filed with this Court. Respondent's determination in this regard is accordingly sustained. Sheldon continues to contend, however, that he should prevail with respect to some $ 2,683, an amount deducted by him pursuant to a supposed "election" under section 761(a) that Amada Financial not be treated as a partnership. *664 Respondent disallowed the amounts deducted pursuant to the "election." Respondent's determination is presumptively correct. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933). The burden of proving that he is entitled to the claimed deductions is on petitioner. Rule 142(a). Here Sheldon has failed to substantiate or otherwise explain the losses reflected under that election, and he has failed to prove that the provisions of section 761 in any way apply. Petitioners nevertheless urge, here and elsewhere, that respondent has "abandoned" this issue. Petitioners consistently fail to appreciate that, absent clear evidence of a concession by respondent, it is their burden -- not respondent's -- to plead, put forth evidence, and ultimately to prove, that they are not liable for the taxes and additions to tax as determined in the deficiency notices. Respondent's disallowance as to this issue is sustained. Jay-Dee Ventures
Respondent has disallowed Jerald and Delores Sheldons' losses arising from a partnership called Jay-Dee Ventures. Petitioners failed to substantiate the operations, purposes, or alleged expenses of the Jay-Dee partnership. Rule 142(a); Welch v. Helvering, supra. *665 Petitioners claim that Ortega has the records necessary to substantiate the Jay-Dee deductions. As we informed petitioners' counsel at trial, we believe that diligent efforts could have recovered the evidence they claim to have needed. In any event, difficulty in obtaining evidence does not ameliorate petitioners' burden of proof. Burnet v. Houston, 283 U.S. 223, 75 L. Ed. 991, 51 S. Ct. 413 (1931). Respondent's determinations as to the Jay-Dee partnership are sustained. Income from New York Life
Respondent determined that petitioners Jerald and Delores Sheldon received $ 44 in unreported interest income during 1983 from New York Life Insurance Company. Petitioners failed to present any evidence to refute that determination. They had the burden of doing so. Respondent's determination as to this income is thus sustained. Rule 142(a); Welch v. Helvering, supra.
Depreciation of Automobile
Petitioner Lore contests respondent's disallowance of an investment tax credit of $ 1,980 claimed for 1984 relating to the leasing of an automobile. At trial, however, Lore presented no evidence as to the acquisition, use, service, trade or business purposes, or other *666 elements needed to rebut the disallowance. On brief, petitioner attached a document regarding an automobile lease to Lore. This attachment is not part of the evidence in this case. Wegman's Properties, Inc. v. Commissioner, 78 T.C. 786, 791 (1982). In any event, the attachment does not prove Lore's entitlement to the disallowed investment tax credit. Respondent's disallowance is sustained. Additions to Tax Under Section 6653(a), (a)(1), and (a)(2)
Section 6653(a), and, beginning with taxable year 1981, section 6653(a)(1), provide for an addition to tax equal to 5 percent of any underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Beginning with taxable year 1981, section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest payable on the deficiency with respect to the portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. Negligence under section 6653(a), (a)(1), and (a)(2) is the lack of due care or the failure to act as a reasonable person would act under the same circumstances where there is a legal *667 duty to act. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that no part of the underpayments for the years at issue is due to negligence or intentional disregard of rules and regulations. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). The failure of taxpayers to make elementary inquiries and to obtain expert advice in transactions of the magnitude of the ones at issue is not consistent with ordinary sound business practice. Herrick v. Commissioner, 85 T.C. 237, 256 (1985). Moreover, while it may be reasonable for a taxpayer to rely upon an accountant for tax and accounting advice, it is unreasonable to rely upon a tax accountant for advice concerning facts obviously outside of the accountant's field of expertise, such as the economic value and commercial viability of holistic medical equipment. Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989). Therefore, in making a decision to invest, it is unreasonable for taxpayers to "have blindly relied upon an appraisal furnished by the seller." Beck v. Commissioner, 85 T.C. 557, 572 (1985). *668 Instead, investors have a duty to consult with competent advisers who were independent of the program or otherwise to examine the validity of program. Marine v. Commissioner, 92 T.C. 958, 993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). It is also negligent for taxpayers who are engaged in business to claim substantial deductions without keeping supporting books and records. Wexler v. Commissioner, 241 F.2d 304 (6th Cir. 1957). We have considered the testimony and demeanor of petitioners in this case. Each is capable of understanding the nature of the transactions in which he or she reportedly had invested. When it came time for them to report their income, deductions, and credits on their income tax returns, however, they failed to act reasonably or responsibly. Initially we note that in claiming the tax benefits at issue, petitioners held themselves out as individuals who were engaged in a complex leasing business involving purportedly expensive and technically sophisticated pieces of equipment. They were not passive investors, but rather active business participants. Their tax returns each *669 included a Schedule C, "Profit or Loss from Business or Profession (Sole Proprietorship)." Their tax returns included other specialized forms used to claim investment tax credits and depreciation deductions. Yet none of them acted in the way a reasonable person engaged in business would act. Reasonable investors would have investigated the holistic medical equipment, or the furniture-leasing endeavors, before risking the amounts they claim to have invested. They obviously would have done more than rely upon the sales pitch of Ortega and his associates. Here, however, none of petitioners consulted anyone other than Ortega, or Whalen, or other hired associates of Ortega. Moreover, Ortega and his accomplices were plainly not experts in the holistic medical business, or in furniture leasing, nor in any other programs in which they were soliciting investments. Nor have petitioners demonstrated any other basis for a belief that the equipment they allegedly purchased was worth anything near its claimed value, or for believing that the holistic medical program would be a profitable business. Based upon their 1-percent investment, petitioners were obviously not in a position to purchase *670 equipment, worth as much as $ 110,000, based upon the unjustified hope that the equipment would generate substantial income. Petitioners' total investments often represented multiples of their annual incomes, yet none of them even saw the equipment, nor were any of them aware of its existence or installation. They reported substantial earnings and even more substantial losses for the first year of their investments, despite the fact that they had been in business for as little as 1 day in that year. Moreover, the offering materials themselves would have warned reasonable investors that the program was dubious. The HPI promotional materials were obviously hastily and carelessly assembled. They were not serious attempts to interest investors in valid business opportunities. Instead, the HPI brochures provided unconvincing and often incomprehensible explanations of the HPI programs. More specifically, as we pointed out in Lore v. Commissioner, T.C. Memo 1990-56, the basic HPI brochure presented cash-flow tables that first subtracted, then added back, interest expenses to produce a positive cash flow. To a reasonable investor, this procedure would indicate *671 either that no interest was being charged to the investors, or that cash flow would have been negative if the interest had, in fact, been paid. Here, petitioners were undeterred by these materials; they invested anyway.[12]
Additionally, any reasonable person who was involved in the business here at issue would have required, produced, and retained meaningful records of their business, including the names and locations of their machinery and of its lessees, as well as adequate substantiation of the income and expenses of their businesses. See *672 section 6001 and its accompanying regulations. Here, petitioners had no such records; the only reflection of income and expenses was contained in petitioners' tax returns, and these figures were invented by Ortega based upon the projections of the promotional brochures. Petitioners accepted the absence of records, and they did not bother to check the accuracy of their returns. In sum, the prospect of investing huge sums in an unfamiliar, poorly explained, and slipshod holistic medical equipment venture would have raised grave doubts in the mind of any reasonable investor as to the program and its promised tax benefits. But here, none of petitioners exhibited any such doubts. Henninger asked about the absence of first-year income, but accepted Ortega's explanation that costs had been "miscalculated." Jerald Sheldon asked about documentation. But despite his prior accountant's warnings to retain records and receipts, Jerald apparently accepted Ortega's assurance that "everything was legal" without further question. Dana Lore and, presumably, her husband Anthony Lore, saw some furniture in a warehouse. They did not, however, determine whether any other such furniture, including *673 their own, had been leased, or otherwise placed in service. The above factors convince us these petitioners would not risk the amounts they supposedly invested in this obviously dubious program unless they had first been assured that there was no real risk, and that they would receive income tax refunds substantially in excess of amounts they would actually invest. In the words of the Ninth Circuit, "their ignorance is explained by the fact that there is no economic risk." Goldberg v. United States, 789 F.2d 1341, 1343 (9th Cir. 1986). We are thus left with the impression that they purposefully looked away from the realities of Ortega's activities in order to claim the promised tax benefits. We are unconvinced by the statement that each petitioner made in subscribing to the jurat in his or her tax return -- "Under penalties of perjury, I declare that I have examined this return, and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct and complete." If these representations are true, the tax returns themselves should have put petitioners on notice that their tax liabilities were not being properly reported. *674 Petitioners should have done more, under these circumstances, to ensure that their taxes were properly reported and paid. If they had done so -- if they had acted reasonably -- "Diligence and prudence certainly would have averted some, if not all, of the underpayment." Marine v. Commissioner, 92 T.C. 958, 993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Petitioners offer a plethora of defenses to the imposition of additions to tax for negligent or intentional disregard of the rules and regulations. None is availing. Petitioners first point out that this Court will not impose a negligence addition for taxpayers who take deductions in good faith reliance upon the advice of a competent tax adviser. Woodbury v. Commissioner, 49 T.C. 180 (1967). That defense does not help petitioners here. Their only advice came from the promoter of the tax shelter at issue, or from his associates. That advice does not constitute the competent disinterested tax advice that forms a basis for reasonable reliance. See Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioners additionally urge *675 that Ortega was acting as their agent in running their businesses and that they should thus be insulated from his negligence, or from the later effects of his failure to tell them that the equipment at issue did not exist. They have produced no convincing evidence of an agency agreement. The one written agency agreement in evidence is signed by petitioner Sheldon. It is a vague and unfocussed agreement providing only that Amada may investigate business opportunities on Sheldon's behalf. Additionally, in situations such as that presented here, we will hold petitioners liable for negligence notwithstanding their attempts to insulate themselves from their tax shelter businesses by having their equipment installed and serviced by an unrelated service company. See Rogers v. Commissioner, T.C. Memo 1990-619. Petitioners also argue that they merely acted like more than a hundred others who also invested in the HPI program. The fact that others may have acted with equal disregard for the requirements of claiming legitimate deductions and tax credits does not excuse petitioners' conduct. Lore v. Commissioner, T.C. Memo 1990-56. [13]
*676 Nor are petitioners aided by claims that, after the years at issue, they filed amended returns and made payments of the deficiencies. Their hindsight comes too late to change the fact that their underpayments are a result of their negligent or intentional disregard of the governing rules and regulations. Petitioners' principal defense is that they are unsophisticated and uninformed about the complexities of the tax laws, and that they were duped by an unscrupulous promoter. They, therefore, urge that they are not subject to the additions to tax for negligence. However, "At some point, naivete becomes a purposeful refusal to analyze the facts, perhaps due to the expectation that the tax benefits, alone, will justify the investment." Flowers v. Commissioner, 80 T.C. 914, 940 (1983). Petitioners are neither so naive nor uninformed as they would now have us believe. They did not need to be versed in tax law to know that they should seek competent advice before making very large investments in businesses they knew nothing about. Nor can we find they were unaware that they would need to keep records for their businesses, in case respondent should examine their *677 returns. Here, however, rather than assuming responsibility for their businesses and taxes, petitioners preferred to rely entirely upon Ortega. They thus failed to demonstrate reasonable attempts to report their tax liabilities accurately. To the contrary, they followed Ortega's lead in ignoring the rules and regulations. [14] They willingly went along with Ortega's practice of collecting the bulk of petitioners' downpayments only when their tax refunds had come in. They did not invest with any realistic prospect for economic profits, nor with any intention to risk the substantial amounts they supposedly invested. Instead, their investments were based upon Ortega's demonstrations that the tax savings from his programs would substantially exceed the amounts of cash that petitioners invested. The deficiencies at issue bear out his demonstrations; petitioners' tax refunds, plus taxes saved through claimed credits and deductions, always exceeded the amounts any of them invested. Petitioners were thus retrieving money that should have been paid as taxes, investing some of it in HPI, and keeping the rest. *678 Petitioners are liable for the additions to tax for negligent or intentional disregard of rules and regulations under section 6653(a), or (a)(1), plus additions to interest under section 6653(a)(2), as set forth in the notices of deficiency. See Marine v. Commissioner, 92 T.C. at 993. Additions to Tax Under Section 6661
Respondent determined that petitioners Sheldon and Brett and Paula Cushing are liable for an addition to tax under section 6661 for the year 1983. Section 6661 imposes an addition to tax for underpayments attributable to substantial understatements of income tax. On additions assessed after October 21, 1986, the rate of the addition is 25 percent of the amount of the underpayment attributable to a substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement of tax is substantial if it exceeds the greater of 10 percent of the amount of tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1). An understatement is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Woods v. Commissioner, 91 T.C. 88 (1988). *679 The understatement is reduced by the amount of items for which the taxpayer can produce substantial authority. If the item at issue is attributable to a tax shelter, however, the amount of the understatement may only be reduced when there is substantial authority for the taxpayer's position and the taxpayer reasonably believed his tax treatment of the item was more likely than not the proper treatment. Sec. 6661(b)(2)(B)(i), 6661(b)(2)(C)(i). In this regard, a tax shelter is defined as a partnership, entity, plan, or arrangement whose principal purpose is the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii). Petitioners have the burden of demonstrating that they are not subject to the additions to tax under section 6661. Enoch v. Commissioner, 57 T.C. 781 (1972). They have failed to do so. The understatements were apparently substantial; petitioner Sheldon reported zero tax liability for 1983; respondent determined that his correct liability was $ 7,150. The Cushings reported a tax liability of $ 952 for 1983; their correct liability was determined to be $ 9,763. Additionally, as its promotional materials and the facts of its operation *680 demonstrate, the HPI program was a tax shelter. Petitioners have not shown that the purpose of the HPI program or the furniture-leasing program was to produce an economic profit separate from the tax benefits. See Lore v. Commissioner, T.C. Memo 1990-56. Indeed, correspondence to petitioners plainly labels the program as a "tax shelter." Moreover, there is no evidence that Sheldon or the Cushings had substantial authority for deducting the amounts at issue, nor have they demonstrated their reasonable belief that the tax treatment of the deductions and credits at issue was more than likely the proper treatment. We hold that these petitioners are liable for the addition to tax under section 6661, if their understatements exceed the greater of $ 5,000 or 10 percent of the tax required to be shown on their returns. We further hold that all of their underpayments are attributable to such substantial understatement. We leave it to the Rule 155 computations to ascertain if petitioners fall within the arithmetical standards for imposition of this addition. Increased Interest Under Section 6621(c)
Respondent also determined that petitioners are subject to the *681 increased interest under section 6621(c). Section 6621(c) imposes increased interest on tax-motivated transactions. The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). Section 6621(c)(3)(A)(v) includes sham or fraudulent transactions within the scope of tax-motivated transactions; cf. sec. 301.6621-2T Q4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50390 (Dec. 28, 1984). Because the underpayments in this case were attributable to transactions that were sham or fraudulent transactions, the increased interest applies. In sustaining respondent's determination, we have considered the fact that some of the underpayment resulted from respondent's disallowance of deductions attributable to Sales and Service or to Jay-Dee Ventures. Both Sales and Service and Jay-Dee Ventures were apparently creations of Tony Ortega. On the record in this case, we have no reason to presume that either of these entities was anything other than a tax-avoidance scheme. In all events, Sheldon failed to introduce any evidence to refute the determination that the Sales and Service partnership was a tax-motivated transaction. Jerald *682 and Delores Sheldon similarly failed to produce evidence to refute the determination that Jay-Dee Ventures was a tax-motivated transaction. Petitioners have the burden of proof as to these determinations, and we have no choice but to sustain respondent in this regard. Innocent Spouse Relief
More than 6 months after the trial in this case, petitioner Joyce Henninger filed Petitioner's Motion to Amend Pleadings to Conform to the Evidence. Therein she seeks to argue that she was entitled to innocent spouse relief under section 6103(e). Her motion is dated the day before the opening briefs in this case were due. That motion was denied. We will not consider an issue raised in such a tardy fashion. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 349 (1991). Moreover, even if we were to consider her claim, it is clear that, on this record, she could not prevail. The burden is on petitioner to prove that she is entitled to innocent spouse relief. Bokum v. Commissioner, 94 T.C. 126, 138 (1990). She must therefore establish, among other things, that it is inequitable to hold her liable for the deficiencies here at issue. Sec. 6013(e)(1)(D); *683 sec. 1.6013-5(b), Income Tax Regs. Joyce Henninger's former husband has testified that she benefited from the HPI program by being paid for her share of the tax benefits that we have here disallowed. She did not appear before us to present testimony that would refute his statements. Additionally, the divorce settlement indicates that Joyce Henninger's former husband will indemnify her from all liabilities arising from the programs at issue. Under these circumstances, she has not proved that it would be inequitable to find her liable for her share of the deficiencies at issue. In view of the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Dana K. Morgan, docket No. 20570-87; David L. Henninger, docket No. 20574-87; Scott G. Sheldon, docket No. 1645-88; Jerald L. Sheldon and Dolores Sheldon, docket No. 1647-88; Jerald L. Sheldon, docket No. 1648-88; Anthony J. Lore, docket No. 14941-88; and Brett Cushing and Paula K. Cushing, docket No. 17723-88.↩
2. Rule references are to this Court's Rules of Practice and Procedure, and section references are to the Internal Revenue Code as amended and in effect for the period under consideration.↩
3. Respondent initially sought to impose additions to tax under sec. 6659 upon petitioners. On brief, however, he conceded the inapplicability of those additions. For the 1983 tax year of Brett Cushing and Paula K. Cushing, respondent now seeks to impose an addition to tax under sec. 6661 in the alternative to the imposition of an addition under sec. 6659.↩
4. For 1980 the additions listed under sec. 6653(a)(1) arise under sec. 6653(a). For years after 1980, respondent has also determined additions of 50 percent of the interest due under sec. 6653(a)(2) for all petitioners.↩
5. See supra↩ note 4.
6. In an earlier proceeding, Lore v. Commissioner, T.C. Memo 1990-56↩, Lore conceded the deficiencies at issue for his 1983 year, based upon his discovery that the HPI equipment did not exist. In that case, we held that Lore was subject to additions to tax for negligence and for substantial understatement of income tax for 1983.
7. In Morgan v. Commissioner, T.C. Memo 1990-338↩, we denied Dana Morgan's motion for summary judgment in this case, holding that the notice of deficiency sent to her for the years at issue was valid, and that, accordingly, we possessed jurisdiction to determine the matters here at issue for those years.
8. We have ordered that the decisions in these cases be entered pursuant to Rule 155. We note that petitioners urge generally that respondent has failed to take into account income averaging and other matters. In this regard, we point out that petitioners have not proved, on this record, any error in respondent's determinations other than as set forth elsewhere in this Opinion.↩
9. We do not address the efforts made by Ortega to settle his differences with petitioners by offering promissory notes to them for the amounts invested. Those events took place after the years at issue.↩
10. In Lore v. Commissioner, T.C. Memo 1990-56, we found that Ortega informed Lore of the nonexistence of the HPI equipment in 1984. The record now before us supports the finding that Lore did not learn of the equipment's nonexistence until 1985. We need not resolve this discrepancy in view of the fact that Lore obtained a "Confession of Judgment" and partial repayment of the amounts he now seeks to claim as a theft loss. The possibility of reimbursement, which existed after 1984, prevents his claiming a theft loss for that year. Sec. 1.165-1(d)(3), Income Tax Regs.↩
11. The rate of interest allegedly applicable to these short-term loans indicates that in some instances, the interest paid should have been greater than set forth above. The record, however, fails to support such greater amounts.↩
12. Petitioners urge on brief that the brochures' cash-flow analysis is clear and straightforward -- once it is understood that interest payments are separately identified as such in some parts of the analysis and, in other parts, incorporated as part of "lease payments." This interpretation, if true, was not obvious to the Court in either of the two cases which have addressed the brochures, and we are certain that it was not obvious to potential investors in the HPI program.↩
13. Petitioners also complain that, in determining the addition to tax for negligence, respondent has imputed the conduct of certain of them onto all of them. We do not perceive this to be the case. As our Findings of Fact and Opinion reveal, we have considered the cases of each of the petitioners separately. Their complaints cannot overcome the convincing evidence that all petitioners exhibited certain common actions, or failures to act, that in each instance demonstrate negligent or intentional disregard of the rules and regulations.↩
14. Petitioners assert that they could not be liable for negligence in 1983 when, allegedly, Ortega himself was not aware that the equipment did not exist. Even if we were to assume that Ortega did not know of the equipment's nonexistence when he filed petitioners' 1983 returns, we believe that adequate investigation of the program at that time would have revealed not only the absence of the equipment allegedly purchased, but also Ortega's failure to discover or to report that absence. Petitioners' unreasonable failure to investigate the program persisted into 1984, when reasonable efforts by the petitioners would have disclosed the fact, then concededly known to Ortega, that the equipment at issue did not exist.↩